UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

United States of America,

        Plaintiff,

v.

Jesus Rubio Duran (2),

        Defendant.

Criminal No. 14-392 (ADM/SER)

**REPORT AND RECOMMENDATION**

---

Thomas Calhoun-Lopez, Esq., United States Attorney's Office, 300 South 4th Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff.

Kirk M. Anderson, Esq., Anderson Law Firm, PLLC, 310 Fourth Avenue South, Suite 7000, Minneapolis, Minnesota 55415, for Defendant.

Scott A. Lewis, Esq., Scott Lewis Law Firm, P.A., 250 2nd Avenue South, Suite 225, Minneapolis, Minnesota 55401, for Defendant.

---

STEVEN E. RAU, United States Magistrate Judge

The above-captioned case came before the undersigned on Defendant Jesus Rubio Duran's ("Duran") Motion to Suppress Physical Evidence [Doc. No. 51] and Motion to Suppress Statements [Doc. No. 52] (collectively, the "Motions to Suppress"). This matter was referred for the resolution of the issues raised in Duran's Motions to Suppress pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that the Motions to Suppress be denied.

**I.      BACKGROUND**

On December 1, 2014, a grand jury indicted Duran and co-defendants Alejandro Reyes-Rojas ("Reyes-Rojas") and Jose Luis Valencia ("Valencia") with one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846.

(Indictment) [Doc. No. 25 at 1]. Reyes-Rojas and Duran were also charged with one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (*Id.* at 2).

Reyes-Rojas did not file pretrial motions and pleaded guilty on February 4, 2015. (Letter to Mag. Judge Dated Dec. 22, 2014) [Doc. No. 49]; (Minute Entry Dated Feb. 4, 2015) [Doc. No. 70]. Valencia withdrew his pretrial motions. (Letter to Mag. Judge Dated Feb. 20, 2015) [Doc. No. 72]. Duran filed several pretrial motions, and a hearing was held on February 23, 2015. (Minute Entry Dated Feb. 23, 2015) [Doc. No. 73]. Sergeant Burt Emerson ("Sergeant Emerson") and Officer Christian Freichels ("Officer Freichels") testified on behalf of the Government, and the Court received one exhibit, a search warrant, into evidence. (Ex. & Witness List) [Doc. No. 74]. The parties submitted supplemental briefing. *See* (Minute Entry Dated Feb. 23, 2015). The Court issued an order on Duran's non-dispositive motions, and took Duran's Motions to Suppress under advisement on March 24, 2015. *See* (*id.*);[1] (Order Dated Feb. 25, 2015) [Doc. No. 76].

## II.   FACTS[2]

On November 5, 2014, Officer Freichels and other law enforcement officers executed search warrants at addresses on Nebraska Avenue and Larpenteur Avenue in Maplewood,

---

[1]   The Court anticipated taking the Motions to Suppress under advisement on March 23, 2015. (Minute Entry Dated Feb. 23, 2015). But because the Government filed its brief one day late, the Motions to Suppress were taken under advisement on March 24, 2015. *See* (Gov't's Resp. to Def.'s Mem. in Supp. of Mots. to Suppress, "Gov't's Resp.") [Doc. No. 82].

[2]   The facts presented in this section are drawn from the testimony at the hearing. *See generally* (Tr. Dated Feb. 23, 2015, "Tr.") [Doc. No. 79]. Some of these facts contradict or are supplemented by those facts in the affidavit submitted in support of the search warrant, which are described separately in the context of the probable cause analysis for the search warrant. *See* (Gov't's Ex. 1); Part III.B.2.a., *infra*.

Minnesota.³ (Tr. at 21). As a result of the search warrant executed on Nebraska Avenue, the officers discovered "a large amount of currency, drug ledgers, and a small amount of drugs." (*Id.*). The execution of the Larpenteur Avenue search warrant yielded "a digital scale that had [m]ethamphetamine residue on it." (*Id.* at 21–22). During the Larpenteur Avenue search, Reyes-Rojas, who was previously unknown to law enforcement, entered the apartment. (*Id.* at 22, 32). Law enforcement officers' investigation suggested Reyes-Rojas entered the apartment to pick up drug proceeds. (*Id.* at 24). The officers arrested and searched Reyes-Rojas but did not find any drugs or guns. (*Id.* at 32); *see also* (*id.* at 23). He had been driven to that location by a Mr. Rivas ("Rivas"). (*Id.* at 22). Officers searched Rivas's vehicle and did not find any drugs or guns. (*Id.* at 32). After speaking to Reyes-Rojas and Rivas, officers determined that they had come from an apartment on McKnight Avenue, and Rivas agreed to show the officers where the apartment was located. (*Id.* at 22). The McKnight Avenue apartment was Reyes-Rojas's apartment. (*Id.* at 23). Rivas identified a man who was driving around in the parking lot near the McKnight Avenue apartment as a person who had come from the McKnight Avenue apartment. (*Id.* at 22–23). Sergeant Emerson, who was conducting surveillance on the McKnight Avenue apartment at the direction of Officer Freichels, believed that the individual driving around in the parking lot was waiting for someone or conducting counter-surveillance, meaning he was looking for signs of someone conducting surveillance on the apartment. (*Id.* at 7–8, 10–11); *see also* (*id.* at 22–23).

Officer Freichels was concerned that Reyes-Rojas's associates may learn that Reyes-Rojas was arrested. *See* (*id.* at 23). Additionally, the occupants of the McKnight Avenue apartment appeared concerned that they were being watched. (*Id.*). A person who was cooperating with law enforcement in this investigation previously told Officer Freichels that if

---

³   The testimony is unclear regarding the city in which Nebraska Avenue is located.

members of the drug trafficking organization ("DTO") learned or suspected that one of their associates was arrested or unreachable, the DTO members may "try to remove or destroy evidence." (*Id.* at 23–24). For these reasons, Officer Freichels believed "time was of the essence" because evidence in the McKnight Avenue apartment may be lost if law enforcement officers did not "obtain a search warrant or go knock at the door immediately." (*Id.* at 23). Freichels ordered investigators to knock on the door of the McKnight Avenue apartment. (*Id.* at 23, 25). The investigators included Sergeant Emerson, Commander Richard Clark ("Commander Clark"), Investigator Chris Tayson ("Investigator Tayson"), and Investigator John Ferrian ("Investigator Ferrian"), who had been conducting surveillance with Sergeant Emerson. (*Id.* at 8, 11).

The investigators were wearing street clothes and vests that either said "police" or "sheriff" on both the front and back. (*Id.* at 18). Their badges were visible, but Sergeant Emerson could not recall whether he or any of the other officers had their weapons drawn. (*Id.*). One of the officers knocked on the door, which was opened by Duran. (*Id.* at 12). At that point, law enforcement officers working on the investigation did not know anything about Duran. (*Id.* at 34). Commander Clark asked Duran something along the lines of "May we come in?" or "[D]o you mind if we come in?" or "Can we come inside and talk?" (*Id.* at 13, 19). Duran was standing in the doorway, and in response to Commander Clark's question, "pivoted on his foot to the side while raising one arm, sort of [at] waist level[.]" (*Id.* at 13–14). Sergeant Emerson interpreted this gesture to be an invitation to enter the apartment. (*Id.* at 14).

When the investigators entered the apartment, they saw the same person who officers believed was conducting counter-surveillance in the living room. (*Id.*). Investigators Tayson and Ferrian stayed with this individual while Sergeant Emerson and Commander Clark conducted a protective sweep. (*Id.* at 14–15). The protective sweep consisted of checking "the bedroom and

4

the bathroom just to make sure no one else was in the apartment" because they knew very little information about the apartment and drug traffickers frequently have weapons. (*Id.* at 15). During the sweep, Sergeant Emerson and Commander Clark saw, in plain view in the bedroom, a "bag of drug packaging materials that was consistent with the previous investigation." (*Id.* at 15);[4] *see also* (*id.* at 25). Sergeant Emerson provided this information to Officer Freichels, and then "froze" the apartment, meaning the officers ensured that no one destroyed evidence, that there were no weapons, and that no one went into or out of the apartment until a search warrant was obtained. (*Id.* at 15); *see also* (*id.* at 11). Duran and the other occupant were handcuffed and waited with the officers. (*Id.* at 15–16). None of the officers conducted any additional searches during this time. (*Id.*).

Officer Freichels obtained a search warrant from a Ramsey County District Court judge that authorized a search of the McKnight Avenue apartment. (*Id.* at 26); *see* (Gov't's Ex. 1). Officer Freichels, who was wearing street clothes and carrying a concealed weapon, executed the search warrant between 6:00 p.m. and 6:30 p.m. that day and found approximately two pounds of methamphetamine. (*Id.* at 27, 30, 35). He asked for a Spanish-speaking law enforcement officer to come to the apartment because he wanted to interview Duran, who did not speak English. (*Id.* at 27–28, 36–37). Officer Freichels, Officer Aguirre, the Spanish-speaking officer, and Duran spoke in the back bedroom. (*Id.* at 29).[5] Officer Aguirre read Duran a standard DEA card containing *Miranda* warnings in Spanish. (*Id.* at 28–29). Although he did not sign a waiver,

---

[4] It is not clear from the testimony whether "the previous investigation" refers to the search warrants executed earlier that day, or some other investigation. *See* (*id.* at 15).

[5] Although Officer Aguirre is not a certified interpreter, he grew up speaking Spanish with his family. (Tr. at 37). Officer Aguirre has been a reliable interpreter in the past and is trusted by his fellow officers. (*Id.* at 40).

Duran said that he understood his rights, and he agreed to talk to Officer Freichels. (*Id.* at 28–29, 37).

During the interview, Duran acknowledged that he knew methamphetamine was in the apartment. (*Id.* at 29). He denied being involved in selling drugs, but admitted that he deposited money into Wells Fargo bank accounts under the direction of Reyes-Rojas. (*Id.* at 29–30). When Officer Freichels attempted to get more information about depositing money, Duran declined to answer those questions. (*Id.* at 30). The conversation lasted ten minutes, and Duran was calm throughout and did not raise his voice or have any emotional outbursts. (*Id.* at 30–31). Officer Freichels did not raise his voice or draw his weapon. (*Id.* at 30). Officer Freichels believed Duran to be of average intelligence; Duran provided coherent answers, and did not mention any type of medical problem. (*Id.* at 31).

### III.    MOTION TO SUPPRESS PHYSICAL EVIDENCE

Duran argues that the officers' initial warrantless entry into the apartment was not justified by voluntary consent or exigent circumstances. (Def.'s Mem. of Law in Supp. of Mots. to Suppress, "Duran's Mem. in Supp.") [Doc. No. 80 at 5–8]. Thus, Duran argues that any items observed during the protective sweep should not have been included in the search warrant. (*Id.* at 8–9). Absent those items, Duran argues the search warrant is not supported by probable cause. (*Id.*).

#### A.    Legal Standard

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "'Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few

6

specifically established and well-delineated exceptions.'" *United States v. Brown*, 634 F.3d 435, 438 (8th Cir. 2011) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

"A defendant's voluntary consent to be searched is an exception to the Fourth Amendment's warrant requirement." *United States v. Esquivias*, 416 F.3d 696, 700 (8th Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). "[A] consent to a search is voluntary unless, in light of all the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. Magness*, 69 F.3d 872, 874 (8th Cir. 1995) (internal quotation marks omitted). "[T]he Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Cedano-Medina*, 366 F.3d 682, 685 (8th Cir. 2004) (internal quotation marks omitted). When determining whether consent was voluntary, a court considers four factors related to the individual:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his or her] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

*United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010) (internal quotation marks omitted). A court also considers six environmental factors:

> (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id.* (internal quotation marks omitted). The voluntary consent inquiry focuses on what an officer reasonably believes, rather than an individual's subjective intent regarding whether he gave consent. *Cedano-Medina*, 366 F.3d at 685. Additionally, "a person can render a search legal by

7

behaving in a way that would cause a reasonable person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent." *Id.* at 684–85.

In determining if probable cause exists to authorize a search warrant, a court considers the information that was before the issuing magistrate judge and affords "great deference to the issuing judge's determination." *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009). Where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotation marks omitted). Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002). Moreover, "'[t]he source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence.'" *Id.* (quoting *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999)).

  **B.**  **Analysis**

    **1.**  **Entry into the McKnight Avenue Apartment**

Duran argues his consent to police officers entering the McKnight Avenue apartment was not voluntary because the four police officers were wearing vests or jackets that said "police" or "sheriff" on the front, and because Commander Clark did not speak to him in Spanish. (Duran's Mem. in Supp. at 6). The Court finds that, under the totality of the circumstances, Duran voluntarily consented to the police entering the apartment.

In light of the factors described above, the only factor that weighs against finding Duran's consent was voluntary is that he was not read his *Miranda* rights. But because the

Eighth Circuit does not require a suspect to be given *Miranda* warnings in order to find consent to enter voluntary, the absence of a *Miranda* warning is not dispositive. *See United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007) ("We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary.").[6]

The record does not reflect any facts that can aid the Court in determining whether Duran was aware of the legal system's protection for suspected criminals through prior experience and whether the consent was given in a public location. Therefore, these factors are neutral.

The remaining seven factors weigh in favor of finding that Duran's consent was voluntary. Duran is of average intelligence, was not experiencing any medical issues, and did not appear to be under the influence of any drugs. (Tr. at 31). Duran was not detained, and the police did not use threats, physical intimidation, or punishment to extract consent. The police did not make any promises or misrepresentations, and at the time Duran consented, he was not in custody or under arrest. Finally, there is no testimony or other evidence that he objected to the search.

The fact that Commander Clark spoke to Duran in English, instead of his native Spanish, is not dispositive. When asked if the officers could enter, Duran responded by "pivot[ing] on his foot to the side while raising one arm, sort of [at] waist level," which the officer interpreted as an invitation to enter the apartment. (*Id.* at 13–14). The voluntary consent inquiry focuses on what an officer reasonably believed, not Duran's subjective intent. *See Cedano-Medina*, 366 F.3d at 685. "[A] person can render a search legal by behaving in a way that would cause a reasonable

---

[6] Courts evaluate whether consent to enter was voluntary using the same factors as whether consent to search was voluntary. *Compare United States v. Lindsey*, Crim. No. 10-15 (JNE/JJK), 2010 WL 4822939, at *23 (D. Minn. July 20, 2010), *adopted in relevant part by* 2010 WL 4822925 (Nov. 22, 2010) *with Golinveaux*, 611 F.3d at 959.

person to believe that he or she has knowingly and voluntarily consented, whether or not the person actually intends to consent." *Id.* at 684–85. Here, Duran's gesture was reasonably interpreted as permission to enter the apartment.

After considering all of the circumstances, the Court finds Duran consented to the officers' entry into the apartment.[7]

### 2. Issuance of Search Warrant

Duran argues that evidence obtained unlawfully—the observation of large amounts of U.S. currency and materials commonly used to package methamphetamine in the McKnight Avenue Apartment—was used to support a finding of probable cause to issue the search warrant. (Duran's Mem. in Supp. at 8–9).[8] Absent the unlawfully obtained evidence, Duran argues the search warrant is not supported by probable cause because "[t]here had been no observations of illegal activity at the [McKnight Avenue] apartment, law enforcement had never observed that apartment previously, and there was no contraband found on Mr. Reyes-Rojas or the vehicle that drove him to the apartment on Larpenteur Avenue." (*Id.* at 8–9).

---

[7] The Government bears the burden of showing that a legitimate exception to the warrant requirement applies. *United States v. Kelly*, 529 F.2d 1365, 1371 (8th Cir. 1976). The Government initially argued that the officers' entry into the McKnight Avenue apartment was justified by exigent circumstances. (Gov't's Omnibus Resp. to Def.'s Pretrial Mots.) [Doc. No. 68 at 1]. But because the Government did not address this issue in its supplemental brief, the Court does not address it. *See* (Tr. at 42) (advising the parties that issues not "identified and supported" in supplemental briefing will not be addressed in the Court's Report and Recommendation); *cf.* (Duran's Mem. in Supp. at 6–8) (arguing the exigent circumstances exception to the warrant requirement does not apply).

[8] Sergeant Emerson testified that he saw drug packaging materials, but did not testify that he saw U.S. currency, which is described in the search warrant as "a large amount." *See* (Tr. at 15, 25); (Gov't's Ex. 1 at 4). Both Duran and the Government state that the officers saw U.S. currency. (Duran's Mem. in Supp. at 9); (Gov't's Resp. at 11). Because neither party challenges whether U.S. currency was at the McKnight Avenue apartment, the Court includes it in this Report and Recommendation. The search warrant reflects that the officers also observed money transfer slips and multiple cell phones. (Gov't's Ex. 1 at 4).

10

As addressed above, the Court finds the officers lawfully entered the McKnight Avenue apartment following Duran's voluntary consent. Once inside, the officers conducted a protective sweep of the apartment.[9] (Tr. at 15). As a result of the protective sweep, the officers observed drug packing material and a large amount of U.S. currency in plain view.[10] (*Id.* at 14–15, 25); (Gov't's Ex. 1 at 4). These items were described in the search warrant. (Gov't's Ex. 1 at 4). Because Duran consented to the officers entering the apartment, the protective sweep was lawful, and the officers observed the drug packaging materials and currency lawfully, they were permitted to include a description of the items in the search warrant application.

Duran's other arguments that the currency and drug packaging materials must be excluded from the search warrant are unavailing. First, Duran argues that these items must be

---

[9] Duran does not separately challenge the legality of the protective sweep, and therefore, the Court does not address it. *See* (Duran's Mem. in Supp. at 5–8). Nonetheless, the Court finds the protective sweep was lawful because based on the facts available to the officers and rational inferences, there was a reasonable probability that other individuals were in the apartment that may pose a danger to the officers. *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1006 (8th Cir. 2010) (stating that law enforcement officers may conduct a protective sweep of a residence when they have "'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene'" (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990))); *see also United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) (finding that circumstances demonstrated that law enforcement understood that there was a reasonable probability that the residence "harbored dangerous individuals" and finding the protective sweep lawful); (Tr. at 15) (Sergeant Emerson testifying as follows: "We didn't have a lot of intel on this apartment. We didn't know if there was going to be more people in there. And based on what had led us up to that point in the investigation, the nature of the investigation, drug traffickers frequently have weapons and we just want to make sure no one else was in the apartment.").

[10] Duran does not separately challenge the legality of the police describing in the search warrant affidavit items they discovered in plain view. *See* (Duran's Mem. in Supp. at 5–8). Nonetheless, the Court finds that, because the officers lawfully entered the premises based on Duran's voluntary consent and lawfully conducted a protective sweep, officers lawfully used the items they viewed in plain sight in their search warrant application. *See Fagnan v. City of Lino Lakes, Minn.*, 745 F.3d 318, 323–24 (8th Cir. 2014) (finding description of items in plain view contributed to probable cause to issue subsequent search warrant); *United States v. Schmidt*, 662 F.2d 498, 504 (8th Cir. 1981) (finding that items observed in plain view during a traffic stop, along with other information, contributed to probable cause to issue a search warrant).

excluded from the search warrant because Detective Brady Martin ("Detective Martin"), the affiant, does not have any personal knowledge of the information gained during the initial search of the McKnight Avenue apartment. (Duran's Mem. in Supp. at 8–9). "[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication" among the officers. *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993). Therefore, the officers' information about their observations of a large amount of money and drug packaging materials from the McKnight Avenue apartment was communicated to Detective Martin, who included the information in the search warrant properly. *See id.*

Duran also argues that "the credibility of Det[ective] Martin's averments in the search warrant application are questionable, at best" because Sergeant Emerson's testimony "that nothing was found during the initial search contradicts the averments made in Det[ective] Martin's search warrant application." (Duran's Mem. in Supp. at 9). As an initial matter, Sergeant Emerson did not testify that "nothing was found"; instead, he testified that drug packaging material was found in plain sight during the protective sweep. (Tr. at 15, 25). Additionally, no party argues that the issuing judge considered any other evidence outside Detective Martin's affidavit when signing the search warrant. Therefore, this Court can likewise only consider Detective Martin's affidavit.[11] *See Solomon*, 432 F.3d at 827.

---

[11] Nothing in Duran's memorandum suggests that he is challenging the search warrant under *Franks*, which is a challenge grounded in the argument "that the probable cause determination relied on an affidavit containing false statements or omissions made knowingly and intentionally or with reckless disregard for the truth." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008) (citing, *inter alia*, *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

For the foregoing reasons, the Court concludes that the description of the drug packaging materials and money was lawfully included in the search warrant application.

Duran does not challenge probable cause if, as the Court finds here, the drug packaging materials and the money were lawfully included in the search warrant. *See generally* (Duran's Mem. in Supp.). Therefore, the Court's analysis is complete. Nonetheless, the Court analyzes whether probable cause exists even if the description of money and drug packaging materials was excised from the search warrant, as Duran argues. *See United States v. Hernandez Leon*, 379 F.3d 1024, 1027 (8th Cir. 2004) ("The sufficiency of a warrant affidavit which contains information from an unlawful search is evaluated after deleting that information."); (Duran's Mem. in Supp. at 9).

### a. Search Warrant Affidavit

The search warrant affidavit, signed by Detective Martin, describes the following:[12] Through Detective Martin's investigation into a large-scale DTO, he became aware that Valencia, who resided on Larpenteur Avenue in Maplewood, was an individual responsible for delivering drugs for Veronica Hernandez, the leader of the DTO. He also learned of Jorge Luis Meza Cabrera ("Meza Cabrera"), another delivery person, who resided on Highway 36 West in Roseville. Meza Cabrera was eventually arrested and a search warrant executed at his residence lead to the discovery of twenty-two pounds of methamphetamine and cocaine, as well as $20,000. Meza Cabrera pleaded guilty to federal drug charges.

On November 5, 2014, Detective Martin executed a search warrant at Valencia's residence, where he discovered $80,000 arranged in a manner consistent with narcotics trafficking and "notes detailing drug transactions and money transfers" in the same box. During

---

[12] The facts in this section are found on pages 2 through 4 of the affidavit in support of the search warrant, Government's Exhibit 1.

the execution of the search warrant, Reyes-Rojas arrived, and Valencia told Detective Martin that Reyes-Rojas was there to pick up $10,000 for drugs. After viewing a picture of Reyes-Rojas, a confidential reliable informant ("CRI") advised Detective Martin that "Reyes[-]Rojas was very high up in the DTO and was responsible for picking up United States Currency from the sale of narcotics."

Detective Martin learned that Reyes-Rojas was driven to Valencia's apartment by Rivas. Based on a probable cause search of Rivas's vehicle, law enforcement officers found two empty boxes for scales and money transfer receipts. Detective Martin noted that scales are often used by narcotics traffickers to measure narcotics, especially methamphetamine, and that this particular DTO uses money transfers to send its proceeds to supply sources in Mexico.

Rivas offered to show Detective Martin where he picked up Reyes-Rojas, which was the apartment on McKnight Road. Rivas identified a male driving around the apartment as the same man Rivas saw in the apartment earlier. Investigators knocked on the apartment door, and two Hispanic males, who were unknown to law enforcement officers at the time, permitted the officers to enter the apartment.

Detective Martin stated that he believed the McKnight residence was being used to store drugs and money, and that if Reyes-Rojas does not answer his phone, coconspirators will destroy evidence. The CRI said that members of the DTO will remove or destroy evidence if a coconspirator is arrested. Detective Martin stated that it is common for drug traffickers to use their residences to hide evidence of their business.

        **b.    Probable Cause**

The Court finds the search warrant affidavit supports a finding of probable cause even if the information about the items observed inside the McKnight Avenue apartment are removed

from the affidavit. The affidavit establishes Detective Martin's familiarity with the DTO at issue, and that Valencia is involved. (Gov't's Ex. 1 at 2). A search warrant at Valencia's residence led to the discovery of a large amount of money, stored in a manner consistent with narcotics trafficking, as well as notes regarding drug transactions and money transfers. (*Id.* at 3). Valencia identified Reyes-Rojas as an individual who was at his (Valencia's) apartment to pick up drug money, and the CRI confirmed that Reyes-Rojas is responsible for picking up the money made from the sale of narcotics. (*Id.* at 3–4). The CRI also stated that Reyes-Rojas is "high up" in the DTO. (*Id.* at 4). Rivas, who drove Reyes-Rojas to Valencia's apartment, had empty boxes for scales and money transfer receipts in his car, and both items are associated with drug trafficking. (*Id.* at 3). In other words, a high-ranking individual in the DTO traveled from the McKnight Avenue apartment in a vehicle that contained evidence of drug trafficking to the apartment of a known drug trafficking delivery person, and was there to pick up money earned through drug trafficking. *See* (*id.* at 3–4). Based on these circumstances, the Court finds the search warrant affidavit created "a reasonable probability that the search will lead to the discovery of evidence" of crime at the McKnight Avenue apartment. *Chroback*, 289 F.3d at 1046 (internal quotation marks omitted).

For the foregoing reasons, the Court finds that, even if the information regarding the items observed in plain view are excised from the search warrant, it is still supported by probable cause.

### 3. Conclusion

The Court finds that law enforcement officers lawfully entered the McKnight Avenue apartment following Duran's voluntary consent. While conducting a protective sweep, they discovered, in plain view, a large amount of money and drug packaging materials. *See* (Tr. at 15,

25). The inclusion of this information in the affidavit in support of a search warrant for the McKnight Avenue apartment was proper.

Even if the information about the large amount of money and drug packaging materials was removed from the affidavit, the affidavit provided sufficient probable cause to issue the search warrant. The Court therefore recommends that Duran's Motion to Suppress Physical Evidence be denied.

## IV.     MOTION TO SUPPRESS STATEMENTS[13]

Duran argues that his waiver of his right to an attorney was not voluntary because of the police-dominated environment, because he was in handcuffs for three hours before the interview began, and because he was intimidated by the fact that only Officer Freichels and Officer Aguirre were in the bedroom with him. (Duran's Mem. in Supp. at 11). He also argues he cannot confirm whether Officer Aguirre, "who is not a certified interpreter," read him his rights or did so accurately because the conversation was not recorded, because Duran did not sign any document confirming that he was read his rights, and because Officer Aguirre did not testify at the motion hearing. (*Id.*).

### A.     Legal Standard

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted measures to ensure that a suspect is advised of his or her Fifth Amendment rights before custodial interrogations. 384 U.S. 436, 444–45 (1966). Consequently,

---

[13] Duran argues that "if this Court determines that the initial entry and subsequent search of the apartment was unlawful, then any statements subsequently made by [Duran] must also be suppressed because they are fruits of the illegal search." (Duran's Mem. in Supp. at 10). Because the Court finds the entry into the McKnight Avenue apartment and subsequent search was lawful, the Court does not address this argument.

16

"*Miranda* . . . prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda*, 384 U.S. at 444).

"[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (internal quotation marks omitted). If a waiver is "made with full understanding of the nature of the right being abandoned and the resulting consequences of abandoning the right[,]" the waiver is knowing. *United States v. Soto*, No. 07-CR-0223 (PJS/JSM), 2007 WL 3120816, at *13 (D. Minn. Oct. 23, 2007) (citing *United States v. Bell*, 477 F.3d 607, 612 (8th Cir. 2007)). "'A statement is not voluntary if the totality of the circumstances shows the defendant's will was overborne,' and voluntary statements must not be the result of deception, intimidation, or coercion of the person giving the statement." *United States v. Jimenez*, 478 F.3d 929, 932–33 (8th Cir. 2007) (quoting *United States v. Annis*, 446 F.3d 852, 855 (8th Cir. 2006)).[14] A finding of police coercion is "a necessary prerequisite to a determination that a waiver was involuntary." *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998) (emphasis omitted).

The Court considers both "(1) the conduct of the law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure." *United States v. Aguilar*, Criminal No. 06-CR-396 (RHK/SRN), 2007 WL 902572, at *9 (D. Minn. Feb. 22, 2007), *report*

---

[14] The analysis of whether a waiver of rights is voluntary and whether statements were made voluntarily "is essentially the same." *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013) (citing *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)).

*and recommendation adopted by* 2007 WL 1116843 (Apr. 13, 2007). A court should consider the defendant's "age, education, intelligence, advice of constitutional rights, the length of the detention and questioning, and psychological impact." *Soto*, 2007 WL 3120816, at *14 (citing *Schneckloth*, 412 U.S. at 226).

"The government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence." *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).

### B.     Analysis

Considering the totality of these circumstances, the Court finds Duran's waiver was voluntary, knowing, and intelligent. Duran appears to argue that four armed officers knocking on his door was intimidating. (Duran's Mem. in Supp. at 11). In a similar situation, the Eighth Circuit found that a defendant's waiver of his right to counsel and his post-*Miranda* statement were both voluntary when, *inter alia*, a large group was present to execute the search warrants but only three officers questioned the defendant. *Havlik*, 710 F.3d at 822–23. Additionally, the fact that only Officers Freichels and Aguirre interviewed Duran does not, by itself, demonstrate coercion or intimidation. *See United States v. Mims*, 567 F. Supp. 2d 1059, 1079 (D. Minn. 2008) (JMR/JSM) (finding that "[t]he fact that the interview took place in a windowless room, and that she was not free to exit the room or was not given access to a phone did not amount to coercive conduct on the part of the officers such that this Court could conclude that [the defendant's] will was overborne") (citing *United States v. LeBrun*, 363 F.3d 715, 722–23 (8th Cir. 2004); *United States v. Galceran*, 301 F.3d 927, 930–31 (8th Cir. 2002)); *see* (Tr. at 29).

Similarly, the fact that Duran was handcuffed does not demonstrate that his waiver was involuntary. *See United States v. Carranza*, 39 F. App'x 464, 465 (8th Cir. 2002) (affirming district court finding that defendant's waiver of right to counsel was voluntary when he was

adequately advised of his *Miranda* rights, even though he was "apprehended and handcuffed at gunpoint"). Finally, the length of time that Duran was detained—three hours—is not so long as to be considered intimidating. Thus, nothing in the record demonstrates that Duran's will was overborne, much less by deception, intimidation, or coercion. *See Jimenez*, 478 F.3d at 932–33; *cf. United States v. Liu*, Criminal No. 08-15 (ADM/FLN), 2008 WL 1994977, at *16 (D. Minn. Apr. 7, 2008) (finding the defendant's "waiver of his *Miranda* rights was obtained through intimidation and coercion" when defendant was promised that "if he cooperated, then he would not spend the night in jail").

Duran challenges Officer Freichels's credibility, arguing that he "has no way of knowing if [Duran] was read his *Miranda* warning [or] to confirm the accuracy of Off[icer] Aguirre's translation." (Duran's Mem. in Supp. at 11).

The Government bears the burden of showing, by a preponderance of the evidence, that Duran's waiver is valid. *Haggard*, 368 F.3d at 1024. To that end, the Government presented the testimony of Officer Freichels. Officer Freichels testified that he was present when Officer Aguirre read Duran his *Miranda* rights, and that Officer Aguirre used a DEA card to read Duran his *Miranda* rights in Spanish. (*Id.* at 28–29). Officer Aguirre's use of a DEA card suggests that the recitation was accurate. Officer Freichels testified that Officer Aguirre grew up speaking Spanish with his family, has been a reliable interpreter in the past, and is trusted by his fellow officers. (*Id.* at 37, 40). Duran said that he understood his rights, and he agreed to speak with Officer Freichels. (*Id.* at 28–29, 37). Throughout the interview, which lasted only ten minutes, Duran was calm and appeared to be of average intelligence. (*Id.* at 30–31). His answers were coherent, and he did not mention that he was having any medical issue that may impact his ability to speak to Officer Freichels. (*Id.* at 31). The Court finds the Government has satisfied its

burden of demonstrating that Duran's waiver is valid based on Officer Freichels's testimony as described above. The Court finds Officer Freichels's testimony credible, and nothing in the record suggests a finding to the contrary.[15]

For the foregoing reasons, the Court recommends that Duran's Motion to Suppress Statements be denied.

## V.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that

1. Defendant Jesus Rubio Duran's ("Duran") Motion to Suppress Physical Evidence [Doc. No. 51] be **DENIED**; and

2. Duran's Motion to Suppress Statements [Doc. No. 52] be **DENIED**.

Dated: April 21, 2015

<u>s/Steven E. Rau</u><br>
STEVEN E. RAU<br>
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **May 5, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.

---

[15]   *See United States v. Spencer*, Crim. No. 12-280 (MJD/JJK), 2012 WL 6778520, at *1 n.1 (D. Minn. Dec. 14, 2012) (noting that reliable hearsay evidence is properly relied upon in the context of a motion to suppress hearing) *report and recommendation adopted by* 2013 WL 68635 (Jan. 7, 2013).