## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

       Plaintiff,

    v.

Jesus Rubio Duran,

       Defendant.

**MEMORANDUM OPINION
AND ORDER**
Criminal No. 14-392(2) ADM/SER

---

Thomas Calhoun-Lopez, Esq., Assistant United States Attorney, United States Attorney's Office, Minneapolis, MN, for Plaintiff.

Kirk M. Anderson, Esq., Anderson Law Firm, PLLC, Minneapolis, MN, for Defendant.

---

## I.  INTRODUCTION

This matter is before the undersigned United States District Judge for a ruling on Jesus Rubio Duran's ("Duran") Objections [Docket No. 86] to Magistrate Judge Steven E. Rau's April 21, 2015 Report and Recommendation [Docket No. 85] ("R&R").  In the R&R, Judge Rau recommends denying Duran's Motion to Suppress Physical Evidence [Docket No. 51] and Motion to Suppress Statements [Docket No. 52].  After a thorough de novo review of the record and for the reasons stated below, Duran's Objections are overruled and Judge Rau's R&R is adopted.

## II.  BACKGROUND[1]

On November 5, 2014, Officer Christian Freichels ("Officer Freichels") and other law

---

[1]  The following facts are taken from Judge Rau's R&R, which themselves are drawn from the testimony at the February 23, 2015 hearing.  A condensed version of the facts is presented here; a full recitation of the facts is presented in Judge Rau's R&R.

enforcement officers executed search warrants at two separate addresses in Maplewood, Minnesota, one on Nebraska Avenue and one on Larpenteur Avenue.  At the Nebraska Avenue address, a large amount of currency, drug ledgers, and a small amount of drugs was discovered. At the Larpenteur Avenue address, officers found a digital scale with methamphetamine residue. While law enforcement officers were searching the Larpenteur Avenue address, Alejandro Reyes-Rojas ("Reyes-Rojas") entered the apartment.  The officers believed Reyes-Rojas entered the apartment to retrieve drug proceeds.  Reyes-Rojas was driven to the apartment by Rivas.[2] After speaking with both Reyes-Rojas and Rivas, officers determined that the men had come from Reyes-Rojas's apartment on McKnight Avenue.  Rivas agreed to show the officers where the apartment was located.

After arriving in the vicinity of the McKnight Avenue apartment, Rivas identified a man driving around in the parking lot as someone who was previously inside the apartment.  Sergeant Burt Emerson ("Sergeant Emerson"), who was conducting surveillance of the apartment, believed that the individual was either waiting for someone or conducting counter-surveillance.

The officers reported that the occupants of the McKnight Avenue apartment appeared concerned that they were being watched.  Earlier, an individual cooperating with law enforcement told Officer Freichels that members of the drug trafficking organization under investigation may try to remove or destroy evidence if they suspected or learned one of their associates was arrested or unreachable.  Officer Freichels was concerned that individuals connected to Reyes-Rojas could have learned that he was arrested.  Concerned about evidence destruction, Officer Freichels believed time was of the essence and ordered officers to knock at

---

[2] Rivas' first name does not appear in the record.

the door of the McKnight Avenue apartment immediately.

At least four officers approached the door of the apartment.  The officers were wearing street clothes and vests identifying them as law enforcement.  Their badges were also visible.  It is uncertain if any of the officers displayed their weapons.  One of the officers knocked on the door, which was opened by Duran.  At this stage of the investigation, Duran was unknown to law enforcement.  Commander Richard Clark ("Commander Clark") asked for permission to enter.  In response, Duran turned slightly to the side while raising one arm near his waist.  The investigators interpreted this motion as a gesture for them to enter the apartment.

Upon entering the apartment, the officers observed the same individual who had been previously seen circling the parking lot.  During the course of a protective sweep, Sergeant Emerson and Commander Clark observed drug materials in plain view.  While a search warrant was obtained, Duran and the other occupant were handcuffed.  None of the officers conducted any additional searches prior to the warrant being signed.

Officer Freichels executed the search warrant later that day.  The search revealed approximately two pounds of methamphetamine.  Officer Freichels summoned Officer Aguirre, a Spanish speaking officer, to assist in interviewing Duran in the back bedroom of the apartment.  Officer Aguirre read Duran his <u>Miranda</u> rights from a standard DEA card.  Duran did not sign a waiver form but he stated that he understood his rights and he agreed to speak with Officer Freichels.

Duran's interview lasted approximately ten minutes.  Duran admitted knowledge of the drugs but denied involvement in their sale.  Duran did admit depositing money into a Wells Fargo bank account under the direction of Reyes-Rojas.  During the interview, Duran was calm;

he did not raise his voice or have any emotional outbursts.  Officer Freichels described Duran's answers as coherent and believed Duran to be of average intelligence.  Officer Freichels did not raise his voice or draw his weapon during the interview.  The interview concluded when Duran refused to answer any further questions.

Duran moves to suppress the physical evidence discovered in plain view as a result of the warrantless entry.  Without the evidence discovered by the officers in plain view, Duran argues that the search warrant was not supported by probable cause.  Duran additionally moves to suppress the statements made to Officer Freichels under the theory that his waiver of his right to an attorney was involuntarily obtained because of the police-dominated environment.  In the R&R, Judge Rau recommends denying both motions, concluding  that Duran voluntarily consented to the warrantless entry and that his waiver prior to making any statements to law enforcement was voluntary, knowing, and intelligent.  Duran now objects to the recommendation denying his motions to suppress.

### III.  DISCUSSION

**A.  Standard of Review**

"A district judge may refer to a magistrate judge for recommendation a defendant's motion to dismiss or quash an indictment or information, a motion to suppress evidence, or any matter that may dispose of a charge or defense."  Fed. R. Crim. P. 59(b)(1).  In reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C); see also D. Minn. L.R. 72.2(b).  A district judge "may accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge." Id.

**B.  Motion to Suppress Physical Evidence**

    **1.  Voluntary Consent**

Duran objects to Judge Rau's conclusion that the warrantless entry into the McKnight Avenue apartment was lawful.  Duran argues that the Government did not meet its burden of showing that Duran voluntarily consented to the officers' entrance.  Specifically, Duran's objection focuses on the uncertainty of whether any of the four officers had their firearms drawn at the time Duran opened the apartment door in response to their knock.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "The Fourth Amendment's general prohibition against warrantless searches does not apply when officers obtain voluntary consent from the person whose property is searched or from a third party with common authority over the property."  United States v. Esparza, 162 F.3d 978, 980 (8th Cir. 1998) (citing Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)).  Voluntary consent does not need to rise to the level of waiver and can be voluntary without being an "intentional relinquishment or abandonment of a known right or privilege."  United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 235 (1973)).

To assess whether consent was actually voluntary, courts are directed to examine the totality of the circumstances surrounding the consent, including the following relevant factors:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [her] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for

suspected criminals.  It is also important to consider the environment in which an
individual's consent is obtained, including (1) the length of the detention; (2)
whether the police used threats, physical intimidation, or punishment to extract
consent; (3) whether the police made promises or misrepresentations; (4) whether
the individual was in custody or under arrest when consent was given; (5)
whether the consent was given in public or in a secluded location; and (6) whether
the individual stood by silently or objected to the search.

United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011) (citation omitted) (citing United

States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010)).   The Government bears the burden of

proving voluntary consent.  United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006).

Doran argues that he did not voluntarily consent to the officers' entrance into the

McKnight Avenue apartment.  Doran's objection emphasizes that four officers dressed in jackets

with "POLICE" or "SHERIFF" were standing directly in front of the apartment door, and there

is uncertainty whether any weapons were unholstered or visible.  Setting aside whether or not

any firearms were displayed, there is no evidence that the officers used threats or other means of

intimidation to involuntarily extract Duran's consent.  There is also no evidence to suggest that

the officers acted in an aggressive, confrontational, or otherwise coercive manner to Duran at the

apartment door.  Commander Clark's question to Duran—"May we come in?" or "[Do] you

mind if we come in?" or "Can we come inside and talk?"—lacks any semblance of a coercive

demand or threat.  Tr. [Docket No. 79] 13, 19.

Turning to the question of coercion by the presence of firearms, the record is unclear.

While Sergeant Emerson does not recall whether he or anyone else displayed their firearms,

Duran does not explicitly claim that he opened the apartment door to find one or more of the

officers brandishing their firearms.  Indeed, in his suppression motion memorandum and

objection, Duran only argues the uncertainty of the officer's testimony.  See Def.'s Mem Support

6

Mot. Suppress [Docket No. 80] 6 ("It is important to note that Off. Emerson could not recall if he, or the other officers had their firearms drawn at the time Defendant opened the door, but they were all armed."); Def.'s Obj. R&R [Docket No. 86] 2 ("Not being able to recall whether firearms were drawn, and not actually having them drawn are two (2) very different things.").

Even if this uncertainty is resolved in Duran's favor and firearms were displayed, the result remains the same. The Eighth Circuit's case of United States v. Smith, is instructive. In Smith, local police and FBI agents were about to knock on a suspect's apartment door. 973 F.2d 1374, 1375 (8th Cir. 1992). However, before any law enforcement officer knocked, a woman opened the door and the officers removed their firearms from their holsters. Id. The officers asked, and received, permission from the woman to enter the apartment. Id. After acknowledging that the officers withdrew their weapons when the woman opened the door, the court stated "there was no evidence that [the officers] immediately demanded entry" and "[n]o physical force or threats were used by the officers at any time." Id. at 1376. The same is true here. When Duran opened the door in response to the knock, the officers did not demand entry or use physical force or threats. Duran's assent to the officers entry was voluntary.[3] See United States v. Perez-Ruiz, 322 Fed. Appx. 475, 477 (8th Cir. 2009) ("While officers approached the truck with weapons drawn, removed Zamora's child from the area, and handcuffed Perez-Ruiz and Zamora, these actions do not preclude a finding of voluntariness.").

### 2. Search Warrant

Doran also objects to Judge Rau's finding that the search warrant was valid even if the

---

[3] Duran does not object to Judge Rau's reasoning concerning the other relevant factors, including whether Duran's pivot and hand gesture was an invitation to enter.

evidence discovered as a result of the protective sweep was obtained unlawfully.  Duran argues

that if the results of the protective sweep are excised from the search warrant's probable cause

basis, there is insufficient evidence to make a probable cause determination that supports

issuance of the search warrant.  Judge Rau's conclusion that the search warrant affidavit

provided sufficient probable cause even if the initial McKnight Avenue apartment evidence was

removed from the affidavit is sound.

The exclusionary rule "reaches not only primary evidence obtained as a direct result of an

illegal search or seizure . . . but also evidence later discovered and found to be derivative of an

illegality or fruit of a poisonous tree."  Segura v. United States, 468 U.S. 796, 804 (1984)

(internal quotation marks omitted).  This doctrine, however, does not apply when the connection

between the evidence to be excluded and the constitutional violation is "so attenuated as to

dissipate the taint."  Nardone v. United States, 308 U.S. 338, 341 (1939).  This results when the

Government shows that the evidence was acquired through an independent, untainted, source.

Wong Sun v. United States, 371 U.S. 471, 487 (1963).

"A warrant obtained after an illegal search is not an independent source if either of the

following are true:  'if the agents' decision to seek the warrant was prompted by what they had

seen during the initial entry,' and 'if information obtained during that entry was presented to the

Magistrate and affected his decision to issue the warrant.'"  U.S. v. Swope, 542 F.3d 609, 613

(8th Cir. 2008) (quoting Murray v. United States, 487 U.S. 533, 542 (1988)).  Thus, in order for

the warrant to be an independent source, two questions must be answered in the affirmative:  1)

would the police still have applied for the warrant absent the acquired tainted information, and 2)

is the warrant still supported by probable cause after the tainted information has been removed

from the warrant's supporting application?  Swope, 542 F.3d at 613-14.

Even without knowledge of the evidence discovered during the protective sweep, the officers had sufficient basis to seek a search warrant of the McKnight Avenue apartment.  While executing search warrants at the Maplewood addresses, officers discovered "a large amount of currency, drug ledgers, and a small amount of drugs," and "a digital scale that had [m]ethamphetamine residue on it."  Tr. at 21-22.  Reyes-Rojas, who was arrested while the Larpenteur address search warrant was being executed, was identified by a confidential reliable informant as someone very high up in the trafficking organization who was responsible for collecting the proceeds from the sale of narcotics.  Rivas, who had driven Reyes-Rojas from the McKnight Avenue apartment, agreed to show law enforcement officers where that apartment was.  At the McKnight Avenue apartment, officers believed an individual was driving around conducting counter-surveillance and the occupants of the apartment appeared concerned that they were being watched.

This evidence supports probable cause for the issuance of a search warrant for the McKnight Avenue apartment.  Additionally, the search warrant affiant, Detective Brady Martin ("Martin"), while investigating a large-scale drug trafficking organization, became aware of the criminal activity that prompted issuance of the search warrants for the Maplewood addresses.  As explained above, these warrants precipitated the series of events that led officers to believe criminal activity and likely evidence of narcotics trafficking was present in the McKnight Avenue apartment.  The search warrant for the McKnight Avenue apartment was supported by more than adequate probable cause.  Duran's motion is therefore denied.

**C.  Motion to Suppress Statements**

Duran also objects to Judge Rau's recommendation that the Government satisfied its burden of showing Duran voluntarily waived his right to remain silent before speaking to Officer Freichels.  In support of his position, Duran argues that he was handcuffed for over three hours before he was questioned.  Duran also argues that Officer Aguirre is not a certified interpreter, the conversation was not recorded, an actual waiver was not signed, and Officer Aguirre did not testify at the motion hearing.  None of Duran's objections support overruling Judge Rau's recommendation that Duran's motion be denied.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ."  U.S. Const. amend. V.  In Miranda v. Arizona, the Supreme Court adopted measures to ensure that a suspect is advised of their Fifth Amendment rights before interrogation.  384 U.S. 436, 444-45 (1966).  A defendant's waiver of his Miranda rights must be made voluntarily, knowingly, and intelligently.  Id. at 444.  When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court must determine whether:

> First, the waiver "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second, the suspect must have waived his rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  "The Government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence."  United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).  A finding of police coercion is "a necessary prerequisite to a determination that a waiver was involuntary."  United States v. Turner, 157 F.3d 552, 555 (8th

Cir. 1998) (emphasis omitted).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a reviewing court must determine whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). More specifically, the inquiry should focus on, among other things, "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Duran first argues that his waiver was not voluntary because he opened his door to find four armed officers. As Judge Rau noted, United States v. Havlik dispels any notion that four officers entering the apartment, alone, makes Duran's subsequent statements involuntary. 710 F.3d 818 (8th Cir. 2013). In Havlik, the Eighth Circuit concluded that the defendant's statements were voluntary even where a large number of officers had entered the defendant's property. Id. at 822-23. Also in Havlik, that three officers conducted the questioning did not amount to coercion. Id. Here, Duran spoke with only two officers, insufficient to create such an intimidating atmosphere to render his waiver involuntary. Furthermore, Duran being handcuffed when he waived his rights fails to compromise its voluntariness. See United States v. Gaddy, 532 F.3d 783, 786, 788-89 (8th Cir. 2008) (finding waiver not involuntary when made with

11

hands restrained behind back).  Additionally, nothing in the record suggests that the location where the waiver occurred—the apartment's back bedroom—was inherently coercive or the officers created an intimidating atmosphere.  See United States v. Mims, 567 F. Supp. 2d 1059, 1079 (D. Minn. 2008) (concluding waiver was voluntary despite "[t]he fact that the interview took place in a windowless room" that the defendant was not allowed to exit from).  Finally, Duran's three-hour detention while law enforcement officers waited for the warrant to arrive cannot be considered intimidating.  There is no evidence that this delay was purposeful, or employed to erode Duran's confidence until he acquiesced to answering Officer Friechel's questions.

Duran next argues that because the Miranda warning was not recorded and Officer Aguirre is not a certified interpreter, there is no way to know if Officer Aguirre actually read Duran his rights or if his translation was accurate, especially since Officer Aguirre did not testify at the motion hearing.  Judge Rau addressed these concerns in his R&R and concluded that they did not affect the propriety of Duran's waiver.  Officer Freichels testified that he was present when Officer Aguirre read Duran his rights off a DEA card.  While Officer Aguirre is not a certified interpreter, he grew up speaking Spanish with his family and has been a reliable interpreter in the past and is trusted by his fellow officers.  After Officer Aguirre read the Miranda warning, Duran said he understood his rights and agreed to speak with Officer Freichels.  During the approximately ten minute interview with Officer Freichels, Duran appeared calm, of average intelligence, provided coherent answers, and did not raise concerns of any medical issues that were impacting his ability to speak.  That Officer Aguirre did not testify at the hearing does not act to rebut Officer Freichel's testimony.  Judge Rau found Officer

Freichel's testimony credible and there is no compelling evidence to the alternative.  Nothing in the record can be reasonably construed to conclude that Duran was not read his rights or that Officer Aguirre's Spanish interpretation to Duran was erroneous.

Finally, Duran argues that since he did not sign a waiver or other document to confirm he understood his rights and voluntarily agreed to speak, his consent cannot be considered voluntary.  However, a waiver can be made orally or in writing; it need not assume any particular form.  United States v. Zamarripa, 544 F.2d 978, 981 (8th Cir. 1976).  Indeed, the Supreme Court has noted "that waiver is not a question of form, but of substance."  Thai v. Mapes, 412 F.3d 970, 978 (8th Cir. 2005) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)).

There is no evidence that Duran's statement was extracted through overt, coercive acts of the arresting or interrogating officers.  Nor is there any evidence suggesting that Duran was lured into speaking through direct or implied promises.  To the contrary, Duran's decision to speak with Officer Freichels was voluntary, knowing, and intelligent.  For these reasons, Duran's motion is denied.

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant Jesus Rubio Duran's Objections [Docket No. 86] to Magistrate Judge Steven E. Rau's April 21, 2015 Report and Recommendation [Docket No. 85] are **OVERRULED**;

2.  The Report and Recommendation [Docket No. 85] is **ADOPTED**;

3.      Defendant's Motion to Suppress Physical Evidence [Docket No. 51] is **DENIED**;

and

4.      Defendant's Motion to Suppress Statements [Docket No. 52] is **DENIED.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  May 19, 2015.

14